Filed 1/8/26  Q.N. v. E.H. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| Q.N.,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>E.H.,<br><br>　　　Defendant and Appellant. | H051707<br>(Santa Clara County<br>Super. Ct. No. 23DV000160) |

Appellant E.H. and respondent Q.N. dated for several years until Q.N. ended the relationship when she discovered E.H. had also been dating another woman at the same time.  After their breakup, Q.N. filed a request for domestic violence restraining order (DVRO) against E.H. pursuant to the Domestic Violence Prevention Act (DVPA, Fam. Code, § 6200, et seq.).[1]  E.H. thereafter filed a DVRO request against Q.N.  Following several days of testimony from the parties and witnesses, the court granted Q.N.'s DVRO request and denied E.H.'s DVRO request.  E.H. now appeals those orders, contending the court denied him an opportunity to conduct discovery under the Civil Discovery Act (Code Civ. Proc., § 2016.010 et seq.), erroneously precluded testimony related to Q.N.'s motive for filing her DVRO request, and incorrectly applied the DVPA's definition of "coercive control" in granting Q.N.'s DVRO request.  Because E.H. failed to meet his burden to show reversible error on appeal, we affirm.

---

[1] Because this case involves proceedings under the DVPA, we refer to the parties by their initials to protect the privacy interests of protected persons.  (Cal. Rules of Court, rule 8.90(b)(1), (11).)

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Parties' Relationship and Breakup*

Q.N., a physicist, and E.H., an entrepreneur, began dating in 2019. In 2020, they lived with Q.N.'s family out-of-state and planned to move to California together. In January 2021, when E.H. did not show up for the drive to California, Q.N. ended the relationship and told E.H. to stop contacting her and to get out of her life. Both parties eventually moved to California, albeit separately. E.H. repeatedly texted and emailed Q.N. asking to meet, apologize, and expressed suicidal thoughts. In late January 2021, E.H. texted Q.N. that he was in the emergency room due to an allergic reaction. Out of guilt, Q.N. picked up E.H. from the hospital, and soon after, they resumed their dating relationship.

In December 2022, Q.N. discovered E.H. had purchased a house with another woman, J.J. Q.N. drove to the house, waited outside, and saw J.J. inside. While there, Q.N. observed a car that looked like E.H.'s car drive by the street. When Q.N. confronted E.H. about the house in his and J.J.'s names, he denied it and questioned where Q.N. had obtained such information. He expressed concern about potential identity fraud, or someone spreading false information to intentionally damage their relationship or harm his business. Over text, E.H. stated to Q.N., "I'm freaking out. I'm going to throw up now." He told Q.N. that he asked his business associates and was informed that "this kind of thing is not uncommon," and such "malicious attacks" were "usually intended to cause disruption in a business/deal."

On December 14, 2022, while Q.N. and E.H. were visiting Q.N.'s terminally ill mother out-of-state, Q.N. again asked E.H. about the house and also inquired as to why E.H.'s name was on J.J.'s insurance card that she had discovered. E.H. ultimately admitted he had lied to Q.N.; he was in a romantic relationship with J.J. and had purchased a house with her. That evening, Q.N. ended the relationship and told E.H. to "[g]et out of [her] life."

Unbeknownst to Q.N. at that time, E.H. and J.J. had been in a relationship since at least 2020, had gotten married in July 2022, and were expecting a child together. When E.H. had gone home out-of-state to prepare for his wedding in July 2022, he told Q.N. it was because his parents had been hospitalized due to COVID-19, which was untrue. During this same time and continuing the false narrative, E.H. sent Q.N. details of his parents supposed vital signs and hospitalization status. He also reached out to Q.N.'s sister—a pharmacist—for medical advice regarding his parents' alleged hospitalization.

### B. Allegations Related to Q.N.'s Request for DVRO

On December 14, 2022, Q.N. told E.H., "This is it. This is over. Get out of my life." Q.N. stated that, during their relationship, they had conversations that, once the relationship was over, Q.N. wanted E.H. to never contact her.

After the breakup, E.H. sent multiple text messages to Q.N. to apologize and asked to talk. Over text, E.H. said "I was/am despicable and a liar. I said I loved you, but I still lied to your face." Q.N. did not respond and, by the end of January 2023, she blocked his number on her phone.

On January 27, 2023, Q.N. saw E.H. in his car parked one house away from her apartment, which frightened her. She was informed by colleagues that E.H. had been outside her apartment on two other occasions in February 2023. E.H. admitted that he "sat in the neighborhood where we used to live together," on January 27 but denied being near her apartment for the other times alleged.

Q.N. believed E.H. was also "cyberstalking" her online LinkedIn account because her account history showed the employers or affiliations of persons that had recently searched and/or viewed her profile were connected to E.H. However, E.H. testified he "never searched for [Q.N.] on LinkedIn after we broke up." Q.N. also believed that E.H. was trying to contact her through family members and colleagues because they reached out to her during that period expressing concern for both parties' wellbeing. E.H.

3

admitted he contacted Q.N.'s brother-in-law after their breakup to ask her family to look after Q.N. because her friends had been worried about her.

In February 2023, believing that Q.N. was in Hamburg, Germany for a work event, E.H. traveled there. E.H. sent Q.N. an email, stating "There's no other way to say this . . . I flew to Hamburg in the hopes you're here and we can talk. [¶] If you're here, I know you're busy with [work], but I just can't do this anymore. My life without you is meaningless. [Ellipses in original.]" He sent another email shortly thereafter, stating "I'm sorry. . . . I should have respected your space. I should not be here, I'm sorry. [Ellipses in original.]" E.H. claimed the trip to Germany was arranged before their breakup and that he had business reasons to be there; although, once in Germany, he "was too depressed to engage in work activities" and returned home the next day. E.H. admitted that, "[a]t the time I arrived, I felt that it was potentially an infringement of her space."

When Q.N. saw E.H.'s emails and became aware of his travel to Germany, she was horrified and scared by his conduct. On February 3, 2023, Q.N. emailed E.H., stating "I do not want any communication from you by any means, in person, through friends, emails, phone calls, messages, social media. [¶] DO NOT ever contact me, DO NOT come near me, my home, my work place. [Emphasis in original.]" E.H. responded to her email asking to "talk one last time."

On February 7, 2023, Q.N. reported E.H.'s conduct to the police and her employer. The police made three calls to E.H. and left messages for him to contact them. E.H. ignored them, and testified he believed the police were calling him regarding a traffic citation. A few days later, E.H. attended a business event at Q.N.'s workplace. Although E.H. alleged a colleague had invited him there (the parties' respective occupations have overlapping areas of interest in research and development), he later testified that he suggested that they meet at Q.N.'s workplace. Q.N.'s employer informed

4

her that, without a restraining order, they could not prevent E.H. from coming on the premises.

A week later, while Q.N. was visiting her mother out-of-state, she believed E.H. broke into her apartment. Her housemates found her bedroom door, which she had locked before she left, left wide open. She reported the incident to the police.

On March 2, 2023, E.H. emailed her, "I miss you."

On March 7, 2023, Q.N. filed an ex parte request for DVRO, alleging that E.H. was stalking and harassing her based on the aforementioned incidents. Q.N. included her family members as protected persons in her request. The trial court issued temporary restraining orders against E.H. pending the hearing.

On May 2, 2023, Q.N. filed a supplemental declaration, adding claims of sexual abuse during her relationship with E.H., providing further details related to their breakup, and alleging that E.H. was not complying with the temporary DVRO because he continued, she believed, to "cyberstalk" her LinkedIn account. Q.N. claimed that, on at least five occasions during their relationship, E.H. forced her to have sex with him when she said "no," and after she told him to stop. The first incident occurred in 2019; Q.N. bit him in defense. The other times it happened, Q.N. said she froze, scared that her resistance would cause him to become more violent. Q.N. reported these incidents to the police in March of 2023. E.H. denied her claims of sexual abuse. Q.N. also alleged she attempted to end the relationship several times, but E.H. manipulated her into staying by crying, threatening suicide, or telling her lies to convince her to stay.

As a result of E.H.'s stalking and harassment, Q.N. claimed she had to move out of her apartment, change her work habits in a way that negatively impacted her career growth including removing her name as an author on research papers, lived in fear, and suffered ongoing anxiety and stress.

### C.    Allegations Related to E.H.'s Request for DVRO

On July 12, 2023, E.H. filed a request for DVRO against Q.N., seeking restraining orders against her, an award of attorney's fees, and orders for Q.N. to return his personal property.  The trial court granted temporary restraining orders against Q.N. pending the hearing.

E.H. claimed that, during their relationship, Q.N. physically and sexually abused him, and engaged in mental and emotional abuse.  E.H. alleged that Q.N. slapped his face multiple times, engaged in violent sexual fetishes, and punched him several times on different occasions when she was upset and left bruises.  E.H. provided photographs of bruises on his face and body.  Q.N. denied these claims and pointed to other factors that may have caused E.H.'s bruises such as dental work and biking accidents which occurred during the same time frame of the photographs.  Q.N. also testified that, due to an old injury, her left arm operated at a diminished capacity, and it was not possible for her to cause the injuries depicted in E.H.'s photographs.  On cross-examination, despite her injured left arm, Q.N. admitted that she helped move heavy pieces of furniture from her parents' home.

E.H. also provided a photograph showing a cut on his lip which he claimed was caused by Q.N.'s ring when she slapped him in the face.  Q.N. denied it, stating she typically did not wear rings for safety reasons due to her work.  On cross-examination, Q.N. admitted to photographs and emails provided by E.H.'s counsel showing and referring to her wearing rings.

E.H. alleged that Q.N. threw objects at him, including a lotion bottle, laptop charger, his mobile phone and laptop.  Q.N. admitted to throwing the items to get his attention but stated that she did not throw any of such items towards E.H.

After their breakup, E.H. claimed Q.N. emailed her DVRO request to his business associates and potential investors to damage his reputation and threaten his business relationships.  On the same day Q.N. filed her DVRO request and the court issued

temporary restraining orders, those documents were emailed from an anonymous account to employees at E.H.'s company, advisors, investors and other business associates. E.H. asserted that Q.N. contacted their mutual friends and colleagues to spread details surrounding their breakup to further tarnish his reputation. As a result, E.H. had to take a leave of absence from his company and cancel other professional activities. E.H. claimed Q.N. had "weaponized the legal system" to exact revenge, defame, smear and negatively impact his career, using her DVRO request to further harass him.

Q.N. denied sending the anonymous email to E.H.'s business and contacts. She stated that she sent a copy of the restraining order to her employer (her supervisor, the human resources department, and the threat assessment director), and a women's early career group manager. She also sent it to her career mentors. She claimed she sent the documents for safety reasons at work and to obtain access to resources for domestic violence victims.

E.H. also contended that, after he filed his DVRO request, he received an email from another anonymous account—which he believed to be Q.N.—telling him to kill himself already. Q.N. denied sending the email.

### D.     The Trial Proceedings

The trial court initially set Q.N.'s DVRO request for hearing on March 28, 2023. At E.H.'s request, the matter was continued to May 30, 2023. The court ordered the parties to attend a settlement conference in July and set the matter for a half-day trial on August 9, 2023.

In July 2023, E.H. filed his DVRO request and the matter was set for hearing on the same day as the trial on Q.N.'s pending DVRO request. On August 2, 2023, the parties agreed to continue trial because E.H. had not yet effectuated service of his DVRO request. A week later, with the parties and counsel present, the court scheduled the parties' dueling DVRO requests for a two-day trial to be completed over the course of

7

four days beginning October 25, 2023. The court ordered the parties to exchange exhibit and witness lists by mid-October.

Both parties were represented by counsel throughout the underlying proceedings.

### 1. E.H.'s Discovery Requests and Motion

On August 23, 2023, E.H.'s counsel served a notice for Q.N.'s deposition and 101 document requests. E.H.'s discovery also included 26 special interrogatories, 15 requests for admissions and corresponding form interrogatory no. 17.1 to Q.N., as well as a deposition subpoena and a business records subpoena to Q.N.'s employer. Q.N., through counsel, served objections to the requests on the basis that, amongst other objections, the discovery cutoff had passed, and discovery was not appropriate in DVPA proceedings.

On October 6, 2023, E.H. filed an ex parte application for an order shortening time on service and hearing on his motion to compel Q.N.'s deposition, her production of documents, and monetary sanctions. The trial court granted the order shortening time and set the hearing for E.H.'s discovery motion on October 16, 2023, nine days before trial. Q.N. opposed the motion, arguing that she was not provided with adequate notice of the ex parte application, E.H.'s discovery requests were untimely, he failed to meet and confer, and he failed to establish good cause for the discovery.

On October 16, 2023, E.H.'s discovery motion was heard by a new judicial officer assigned to the department. The court asked the parties to address if the Civil Discovery Act applied to DVPA proceedings or if there was any right to discovery in such proceedings. The court also asked whether the parties had previously discussed conducting discovery with the prior judicial officers assigned to the case, and both parties confirmed they had not. After hearing arguments from counsel, the court found "there is no codified right to discovery in these matters." The court stated that, had there been a prior discussion with the court about conducting discovery and an order for such

8

depositions to take place, there would be a basis for E.H.'s motion to compel. Without a prior court order, however, E.H. did not have authority to enforce his discovery requests as the Civil Discovery Act did not apply. The court denied E.H.'s motion and request for sanctions.

### 2. The Trial on Both DVRO Requests

Prior to trial, each party served notices to the other for their appearance at trial and for each party to produce documents at trial. Q.N.'s trial notice contained 43 document requests related to allegations in the parties' dueling DVRO requests. E.H.'s trial notice contained five requests for documents related to Q.N.'s attorney fees, including her billing statements, canceled checks, third party payments, contracts, and her retainer agreement.

At trial, Q.N.'s counsel asked E.H. why he did not bring documents responsive to Q.N.'s trial notice. E.H. responded, "I did not believe I needed to have any, in accordance to the judge's ruling previously" that the Civil Discovery Act did not apply. Q.N.'s counsel requested clarification from the court and the court stated, "discovery in these matters is governed by the Court with consultation with the parties. So none of the provisions – statutory provisions are going to govern discovery in this case. And so your question to him about whether or not he brought requested discovery, I'm going to find it as irrelevant. And all questions like that in this hearing are going to be irrelevant to the Court too." E.H. did not separately address any issues or objections with respect to Q.N.'s compliance with his trial notice, and did not state on the record whether Q.N. produced any documents at trial in response to his notice.

The court heard testimony from each of the parties, a mutual friend, Q.N.'s friend, and E.H.'s friend. The court admitted multiple exhibits including the parties' text messages and emails and E.H.'s photographs of his injuries. Each party testified and was examined by opposing counsel on the matters supporting the allegations in their

9

respective DVRO requests and in defense to the other's DVRO request, as summarized above.

During trial, E.H.'s counsel also questioned Q.N. on issues related to the payment of her attorney's fees. The court asked for the relevance of such testimony, noting that any attorney fee issues would be addressed after the trial. E.H. claimed the questions "go right to [E.H.'s] theory about one of the reasons why [Q.N.] filed this restraining order." E.H. claimed that Q.N. was angry at him and, with a third party paying her fees, "had no or very little skin in the game in terms of her own pocketbook." Over the objection of Q.N.'s counsel, the court allowed E.H. to question Q.N. about who paid her attorney's fees in the case and about that third-party's relationship to both parties. The court stated, "So I'm going to allow an answer to this question, and then I'm going to evaluate whether or not it is fruitful to go on in this subject matter."

Q.N. testified that her friend, J.P., paid her attorney fees but not "every dime"; and that the last time she spoke to J.P. was February 2023, before she filed her DVRO request. J.P. did not tell or encourage her "one way or the other" to file a DVRO request and did not have any control or influence over her testimony or any of her decisions in the proceedings. She did not send any of the filings in the case to J.P. nor speak with him during the case.

The court initially sustained Q.N.'s objection to a question regarding the amount of J.P.'s contribution to Q.N.'s legal fees under Evidence Code section 352, finding that "the time consumption outweighs the probative value." However, the court reversed its decision and later permitted E.H.'s counsel to ask the question, stating "[t]he court has sustained a 352 objection. I'm going to allow this question, and then we're going to see where we are on 352." Q.N. answered she did not remember the amount, but it was less than $50,000. When E.H.'s counsel asked Q.N. when J.P. paid her fees, the court sustained its own objection under Evidence Code section 352.

10

During E.H.'s testimony, the court allowed his counsel to ask further questions on this issue. E.H. testified that J.P. was a business competitor. In 2022, E.H. and Q.N. had dinner with J.P. because J.P. was trying to recruit E.H. for his business and/or collaborate with him. E.H. claimed he received a message from J.P. "alluding to – that he was with Q.N." E.H.'s counsel asked E.H. if there was "anything else that [he] would like to tell this court about [J.P.]" but then withdrew the question before E.H. responded. Counsel then asked E.H. questions regarding why J.P. would be paying Q.N.'s fees, and Q.N.'s counsel objected on grounds of speculation. The court allowed E.H.'s counsel to lay a foundation for how E.H. would know such information, and, after asking one question pertaining to E.H.'s prior meetings with J.P., E.H.'s counsel moved on from the subject matter.

### 3. The Findings and Orders

On November 3, 2023, the court stated its findings and decisions orally on the record.

As to E.H.'s DVRO request, the court did not find E.H. to be a credible witness. The court referenced the text messages from E.H. where he called himself a "despicable liar," and other text messages between the parties showing E.H.'s deception throughout their dating relationship. The court stated, "In short, [E.H.] engages in acts of deception when it benefits him to do so, regardless of the consequences and without consideration of the harm to others." Because the court found E.H. lacked credibility, the court concluded that he failed to prove the allegations of abuse by Q.N. by a preponderance of the evidence. The court denied E.H.'s DVRO request.

As to Q.N.'s DVRO request, the court found Q.N. to be a credible witness. The court also found that Q.N.'s allegations of coercive control and harassment were "corroborated by text and e-mail messages and the testimony of [E.H.]" Although deception in a relationship may not always amount to abuse under the DVPA, the court

11

noted, "when repeated and elaborate lies are used to exert coercive control over another, it is abuse." The court found that, "between February 2021 and December 2022 [E.H.] made a series of increasingly elaborate and false statements to [Q.N.] in order to manipulate her into continuing their relationship. In doing so, he exercised coercive control over [Q.N.] in violation of the [DVPA]."

The court also found that, "after [Q.N.] broke up with [E.H.] in December of 2022, [Q.N.] expressed to [E.H.] unequivocally that she wanted no further contact. Regardless, [E.H.] repeatedly tried to make contact with [her] by text, e-mail, and in person. These attempts did not cease until [Q.N.] filed and served the restraining order in this case." Accordingly, the court found Q.N. proved by preponderance of the evidence "that the acts of abuse, coercive control, and harassment have occurred and that these acts destroyed [her] mental and emotional calm." The court granted Q.N. the restraining orders requested to protect herself from E.H. for a duration of three years. The court denied Q.N.'s request for her family members to be included as protected persons in the restraining orders.

E.H. timely appealed the court's orders.

## II.    DISCUSSION[2]

E.H. argues the trial court committed several errors: (1) it denied his discovery motion based on an incorrect conclusion that the Civil Discovery Act did not apply to

---

[2] Q.N. filed a motion to strike E.H.'s reply brief and reply appendix on the grounds that (1) they were filed a day late, (2) E.H.'s brief contains new arguments, and (3) the reply appendix contains an unfiled document entitled "Notice to [Q.N.] to Appear and Produce Documents At Time of Hearing" (E.H.'s trial notice). E.H. submitted an untimely opposition to the motion, which Q.N. requests we disregard. Because Q.N. had an opportunity to address E.H.'s opposition during oral argument, we will consider the opposition.

We deny Q.N.'s motion to strike the reply brief and appendix in its entirety based on good cause shown that E.H. attempted to file the documents on the due date, but they were rejected due to formatting errors. We deny Q.N.'s motion to strike arguments

DVPA proceedings; (2) it failed to enforce his trial notice for Q.N. to produce documents at trial; (3) it improperly excluded further testimony under Evidence Code section 352 regarding a third party's payment of Q.N.'s legal fees as it related to Q.N.'s credibility and motive; and (4) it erroneously defined and applied "coercive control" under Family Code section 6320, subdivision (c), in granting Q.N.'s DVRO request.

Q.N. contends that, even if the Civil Discovery Act applied, the trial court did not abuse its discretion in denying E.H.'s discovery motion, E.H. forfeited any argument related to his trial notice, and E.H. failed to argue and show prejudice. Q.N. asserts that it was not an abuse of the trial court's discretion to preclude Q.N.'s response as to the single question of when J.P. paid her fees, after E.H. had already asked several questions on that issue. Finally, Q.N. contends her DVRO against E.H. should be affirmed regardless of the court's finding of coercive control, as there is substantial evidence of E.H.'s other harassing and stalking behaviors to support issuance of the DVRO. For the reasons stated below, we affirm the orders.

### A.     Standard of Review and Appellate Principles

Orders made pursuant to the DVPA are reviewed under the deferential abuse of discretion standard. (*In re Marriage of Everard* (2020) 47 Cal.App.5th 109, 123.) Discovery orders, orders related to the enforcement of trial subpoenas, and evidentiary

---

raised in E.H.'s reply as they were responsive to arguments raised in Q.N.'s brief. We grant Q.N.'s motion to strike E.H.'s trial notice from the reply appendix. E.H. failed to show that said document was a part of "the superior court file" or was otherwise provided as an exhibit at trial. (Cal. Rules of Court, rule 8.124(g); *Perez v. Grajales* (2008) 169 Cal.App.4th 580, 592, fn. 11 [inclusion of unfiled documents in appendix is improper]; *Pulver v. Avco Financial Services* (1986) 182 Cal.App.3d 622, 632 ["documents not before the trial court cannot be included as part of the record on appeal and thus must be disregarded as beyond the scope of appellate review"].) However, we note that the appendix filed with E.H.'s opening brief includes Q.N.'s objections to his trial notice and other documents filed in the trial court in response to E.H.'s discovery motion. Accordingly, information related to E.H.'s trial notice, including when said notice was served and the documents requested in said notice, are contained in the record.

13

rulings are also reviewed for abuse of discretion. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 [evidentiary rulings]; *Williams v. Superior Court* (2017) 3 Cal.5th 531, 540 [discovery]; *City of Los Angeles v. Public Utilities Commission* (1972) 7 Cal.3d 331, 352 [order quashing trial subpoena under former Code of Civil Procedure section 1987].)

"The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711.) "The question of whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law [citation] requiring de novo review. [Citation.]" (*Eneaji v. Ubboe* (2014) 229 Cal.App.4th 1457, 1463.) " 'To the extent that we are called upon to review the trial court's factual findings, we apply a substantial evidence standard of review.' [Citation.]" (*In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780.) Finally, as to the trial court's application of the law to the facts, " ' "[a]n abuse of discretion occurs when the ruling exceeds the bounds of reason." ' [Citations.]" (*Salmon v. Salmon* (2022) 85 Cal.App.5th 1047, 1054.)

"A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness. [Citations.]" (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133; *Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.) "We do not review the trial court's reasoning, but rather its ruling. A trial court's order is affirmed if correct on any theory, even if the trial court's reasoning was not correct." (*J.B. Aguerre, Inc. v. American Guarantee & Liability Ins. Co.* (1997) 59 Cal.App.4th 6, 15-16 (*J.B. Aguerre*).)

It is the appellant's burden not only to demonstrate error, but that such error was prejudicial. (Cal. Const., art. VI, § 13; *Parris J. v. Christopher U.* (2023) 96 Cal.App.5th 108, 134 (*Parris J.*).)

### B. Denial of E.H.'s Discovery Motion

We are not persuaded by E.H.'s contention that the trial court erred in concluding he had no statutory right to discovery in DVPA proceedings. As E.H. acknowledged, at the time of the relevant underlying proceedings, the DVPA neither addressed the applicability of the Civil Discovery Act nor provided any authority permitting discovery.

In civil harassment restraining order proceedings, case law suggested that discovery did not apply because "[t]here is no provision under [the civil harassment statutes] allowing for discovery, and in any case, under the civil harassment scheme there is insufficient time in which to conduct discovery." (*Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 650, fn. 11.) A DVPA proceeding, like a civil harassment petition, provides similar expedited and simplified procedures for the victim's protection. (*S.A. v. Maiden* (2014) 229 Cal.App.4th 27, 40-41.) These proceedings incorporate procedural safeguards—for example, the limited duration of restraining orders, the responding party's right to a continuance, the court's authority to modify or terminate the orders—to counterbalance the quickened nature of the process. (*Malinowski v. Martin* (2023) 93 Cal.App.5th 681, 694.) Permitting the full scope of the Civil Discovery Act to DVPA proceedings, therefore, is inconsistent with the expedited purpose of such proceedings. E.H. cites no statutory authority to the contrary. In the absence of such authority, we discern no error in the trial court's conclusion that E.H. did not have a codified right to discovery.[3]

---

[3] Effective January 1, 2024, the DVPA now includes Family Code section 6309, which provides that "discovery pursuant to the Civil Discovery Act . . . is not permitted" unless the trial court authorizes it in accordance with the statute's stated conditions. (§ 6309, subds. (b), (c)(1), and (d).) We requested and received supplemental briefing from the parties on whether we apply the law currently in effect (i.e., Family Code section 6309). (See *Flores v. Dept. of Transportation* (2022) 76 Cal.App.5th 678, 682 (*Flores*) ["in suits for injunctive relief, we 'apply the law currently in effect' at the time of the appellate decision"]; accord *Make UC a Good Neighbor v. Regents of Univ. of Cal.* (2024) 16 Cal.5th 43, 55 (*Make UC a Good Neighbor*).) E.H. and Q.N. both contend that

Moreover, E.H. did not propound any discovery until the eve of the continued trial, almost six months after Q.N. filed her DVRO request. E.H.'s delay is wholly inconsistent with the intended expedited process in place for resolution of domestic violence restraining order petitions.

E.H. further argues that DVPA proceedings are civil proceedings of a special nature. Citing to *City of Los Angeles v. Superior Court* (2017) 9 Cal.App.5th 272 (*City of Los Angeles*), E.H. contends the Civil Discovery Act automatically applies to such special proceedings unless a statute specifies otherwise.

*City of Los Angeles* is not applicable to this case. That case involved petitions to compel government agencies to produce documents under the California Public Records Act (Gov. Code, § 7920.000 et seq.). (*City of Los Angeles*, *supra*, 9 Cal.App.5th at pp. 284-288.) The court concluded that such proceedings are ' "special proceeding[s] of a civil nature" ' in which the Civil Discovery Act applied. (*Id*. at pp. 284-285;.Code Civ. Proc., §§ 2017.010, 2016.020, subd. (a).) The court in *City of Los Angeles* did not address whether discovery applied in DVPA proceedings or whether DVPA proceedings are "special proceedings of a civil nature." E.H. cites several cases related to other special proceedings where the discovery act applied, but none are relevant to DVPA proceedings or even proceedings of a similarly expedited nature. (*City of Los Angeles,* at p. 287 ["expediency is not the 'main goal' of the [California Public Records Act]"].)

Further, we do not reverse the court's order unless the appellant demonstrates that the error prejudiced him; that is, without the error, the outcome would have been more favorable. (*Property Reserve, Inc. v. Superior Court* (2016) 6 Cal.App.5th 1007, 1020 [the appellate court cannot presume prejudice].) E.H. did not establish prejudice. E.H. asserts blanket and conclusory statements that discovery "would shed light on [Q.N.'s]

the statute is inapplicable because it was not in effect at the time the trial court rendered its decision, and that *Flores* and *Make UC a Good Neighbor* are distinguishable. We need not resolve this issue as we affirm the orders on other grounds.

state of mind" and would produce "important pieces of evidence." His generalized statements without any specific discussion of prejudice are insufficient. (*People v. Verdugo* (2010) 50 Cal.4th 263, 282.)

E.H. maintains the denial of discovery deprived him of "any ability whatsoever" to challenge Q.N.'s testimony at trial, and that he faced a "trial by ambush." The record does not support these assertions. Q.N.'s pleadings filed in support of her DVRO request laid out, in detail, each of her allegations of abuse, as well as her anticipated defenses to E.H.'s DVRO request. Her testimony at trial focused on those same allegations. Prior to trial, pursuant to a court order, the parties exchanged exhibit lists and witness lists. Throughout trial, E.H.'s counsel was able to challenge Q.N.'s testimony. For example, after Q.N. testified that she could not have caused E.H.'s injuries because she did not wear rings and her left arm suffered a prior injury, E.H.'s counsel was able to introduce exhibits and elicit further testimony from Q.N. purportedly contradicting those statements. E.H. also presented testimony from a rebuttal witness, who had not been previously disclosed, and elicited testimony from that witness to challenge Q.N.'s statements regarding events after the parties' final breakup. During trial, it more often appeared that Q.N. was the party surprised by exhibits from E.H. that had not been previously exchanged. In each instance, the court allowed E.H.'s exhibits over Q.N.s objection.

Moreover, E.H. admitted at trial that, even after Q.N. asked him not to contact her, he continued to email her, he waited outside her home in his car, traveled to Germany in attempt to meet up with her, and went to her place of work. He conceded that his conduct was "potentially an infringement of her space." Considering such admissions of disturbing the peace of Q.N., we discern no reasonable probability the outcome of E.H.'s case would have been different if his discovery motion had been granted, and E.H. has not provided evidence demonstrating otherwise.

For these reasons, E.H. has not met his burden of proof to show grounds justifying a reversal of the order denying his discovery motion.[4]

## C.    E.H.'s Notice for Q.N. to Produce Documents at Trial

E.H. contends the trial court erred when it refused to enforce his trial notice for Q.N. to produce documents related to her attorney fees based on the court's erroneous conclusion that discovery was not permitted.[5]  E.H. contends he was denied an ability to present his defense that Q.N.'s DVRO request was filed for improper and ulterior motives (i.e., to harm his business interests), as purportedly evidenced by his business competitor's payment of her legal fees.

There are no record citations to show E.H. raised this issue at trial.  E.H. cites to statements made by Q.N.'s counsel with respect to his failure to produce documents responsive to *Q.N.'s* trial notice, but the record is silent as to his efforts to enforce *his* trial notice.  E.H. contends he was not required to raise such issues because, when the court declined to enforce Q.N.'s trial notice, that ruling applied to his trial notice as well.  Specifically, the court stated to Q.N.'s counsel, "and so your question to [E.H.] about whether or not he brought the requested discovery [pursuant to Q.N.'s trial notice], I'm going to find it as irrelevant.  And all questions like that in this hearing are going to be irrelevant to the court too."  We interpret E.H.'s argument as one of futility; that is, since the court had already deemed the issue irrelevant, his objections to Q.N.'s compliance with his trial notice would have been futile.  "[A] party need not object if it would be futile." (*Mundy v. Lenc* (2012) 203 Cal.App.4th 1401, 1406.)  Although the better

---

[4] In light of our conclusion, we do not address Q.N.'s arguments as to the timeliness of E.H.'s discovery requests and motion.

[5] We review E.H.'s arguments only as it applies to his trial notice to Q.N.  We do not consider the trial court's ruling excusing E.H. from compliance with Q.N.'s trial notice as the ruling was made in his favor.  Only a party who is aggrieved may appeal from an appealable order. (Code Civ. Proc., § 902.)  "A party is not 'aggrieved' by a judgment or order rendered in his or her favor. [Citation.]" (*Jones & Matson v. Hall* (2007) 155 Cal.App.4th 1596, 1611.)

practice would have been for E.H. to make an objection to preserve the record, we proceed to consider E.H.'s argument on the merits.

We conclude that, even if the court erred in its application of the law, E.H. has not met his burden to show prejudice.

Code of Civil Procedure section 1987 provides that a party may, in their trial notice, "include a request that the party or person bring with him or her books, documents, electronically stored information, or other things." (*Id.,* subd. (c).) The responding party or person may, within five days, "serve written objections to the request or any part thereof, with a statement of grounds." (*Ibid.*) "Thereafter, upon [the] noticed motion of the requesting party, accompanied by a showing of good cause and of materiality of the items to the issues, the court may order production of items to which objection was made, unless the objecting party or person establishes good cause for nonproduction or production under limitations or conditions." (*Ibid.*) In other words, the responding party's written "objections excuse compliance unless the serving party files a noticed motion with a showing of good cause." (*Garcia v. Myllyla* (2019) 40 Cal.App.5th 990, 997.)

Here, Q.N. served her objections on September 26, 2023, five days after electronic service of E.H.'s trial notice on September 19, 2023. (*Shell Oil Co. v. Superior Court* (1975) 50 Cal.App.3d 489, 491 [time to serve objections extended under Code of Civil Procedure section 1013]; Code Civ. Proc. §§ 1013, 1010.6 [time to respond extended by two court days if electronically served].) E.H. did not contend Q.N.'s objections were untimely. Under Code of Civil Procedure section 1987, subdivision (c), once Q.N. served her objections, the burden was on E.H. to file a noticed motion to enforce his trial notice. There is no evidence that E.H. filed a motion, as required under the statute. Accordingly, even if the court erred in applying the Civil Discovery Act, E.H. has not established prejudice. E.H. would not have been entitled to any relief under Code of

19

Civil Procedure section 1987 because he did not comply with the statute's requirements for enforcement.

Moreover, even if said documents regarding Q.N.'s attorney fees would have shown that she harbored an improper motive, such motive would not negate the compelling evidence of abuse in this case. (See *Michael M. v. Robin J.* (2023) 92 Cal.App.5th 170, 182 ["[T]he mere existence of a retaliatory motive still would not negate the compelling evidence that [the victim] had a reasonable basis to fear [the aggressor]."].) As discussed below, the record contains compelling evidence to support the issuance of a DVRO based on E.H.'s harassment and stalking of Q.N., which he concedes on appeal. Under these circumstances, the court's alleged legal error did not result in prejudicial error.

### D.      Exclusion of Testimony Under Evidence Code section 352

On its own motion, the court precluded further testimony from Q.N. as to when third-party J.P. paid Q.N.'s attorney fees pursuant to Evidence Code section 352. E.H. argues the trial court failed to conduct a balancing test and failed to inquire about the amount of time E.H.'s questions would take on the subject matter. Such abuse of the court's discretion, E.H. asserts, amounted to reversible error because he was denied the opportunity to challenge Q.N.'s credibility, bias and ulterior motives. Specifically, E.H. contends the proffered testimony would further support his claim that Q.N. and J.P. colluded to use the DVPA to harm his career.

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " '[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its

balancing functions under Evidence Code section 352.  [Citation.]' " (*People v. Doolin* (2009) 45 Cal.4th 390, 438; accord, *People v. Harris* (2013) 57 Cal. 4th 804, 845.) " 'That balancing process requires consideration of the relationship between the evidence and the relevant inferences to be drawn from it, whether the evidence is relevant to the main or only a collateral issue, and the necessity of the evidence to the proponent's case as well as the reasons recited in [Evidence Code] section 352 for exclusion.' [Citation.]" (*640 Octavia, LLC v. Pieper* (2023) 93 Cal.App.5th 1181, 1191.)  The trial court has " 'broad discretion to exclude evidence it deems irrelevant, cumulative or unduly prejudicial or time-consuming.' [Citations.]" (*People v. Johnson* (2022) 12 Cal.5th 544, 605.)  " 'To establish an abuse of discretion, defendants must demonstrate that the trial court's decision was so erroneous that it "falls outside the bounds of reason." [Citations.] A merely debatable ruling cannot be deemed an abuse of discretion.  [Citations.]  An abuse of discretion will be "established by 'a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' [Citations.]" (*Id.* at pp. 605-606.)

Here, the record shows that the court was aware of and satisfactorily performed its balancing functions under Evidence Code section 352.  The court inquired into the relevancy of E.H.'s questions regarding who paid Q.N.'s attorney fees.  After E.H.'s counsel responded with his theory that a third party was paying Q.N.'s fees, the court allowed counsel to explore the issue, subject to the court's discretion under Evidence Code section 352.  E.H.'s counsel proceeded to question Q.N. as to who paid her fees, her relationship with said third-party J.P., and J.P.'s field of business.  The court stopped the line of questioning at how much J.P. had paid for Q.N.'s attorney fees, at that point determining that the consumption of time on that issue outweighed its probative value. The court also heard Q.N.'s testimony that J.P. had no influence over her DVRO request, and that she had not spoken to him since a month before she filed her request.  The court then reversed its earlier ruling and allowed E.H.'s counsel to ask Q.N. how much J.P. had

21

paid for her attorney fees but not as to when J.P. paid the fees. Notably, even after drawing that line, the court permitted E.H.'s counsel to ask additional questions related to the connection between J.P. and Q.N. during E.H.'s direct examination. After several questions related to J.P.'s relationship with E.H.'s business and Q.N., E.H.'s counsel independently decided to move on from the subject matter. The evidence was ostensibly offered to impeach the credibility of Q.N. on a collateral issue, i.e., when the third party paid Q.N.'s attorney fees, but the court has wide latitude to exclude evidence that is collateral and not relevant to the underlying action. (*People v. Contreras* (2013) 58 Cal.4th 123, 152.)

Accordingly, after permitting extensive questioning on this issue and establishing that J.P. did indeed pay Q.N.'s fees, the trial court did not abuse its discretion to preclude testimony on *when* J.P. paid Q.N.'s fees under Evidence Code section 352. Given the court's demonstrated continued balancing of the weight of this evidence throughout the cross-examination of Q.N., E.H. has failed to demonstrate that the court's ruling on the question of when the fees were paid fell outside the bounds of reason.

We are also not convinced by E.H.'s argument that the trial court had an "affirmative duty" to explicitly ask him how long his questions would take. The law does not require the court to expressly state its weighing process. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1169.) None of the cases cited by E.H. are applicable. In *Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, 947, the appellate court concluded that excluding all evidence of a primary witness' prior misconduct without further inquiry did not reflect an informed exercise of the court's discretion under Evidence Code section 352. However, it did not establish a requirement for courts to state its inquiries expressly on the record, as E.H. contends. In *California Crane School, Inc. v. National Common for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, 19–20, the issue decided related to trial management, not the exclusion of evidence

22

under Evidence Code section 352. (*Mercury Ins. Group v. Superior Court* (1998) 19 Cal.4th 332, 348 ["A decision . . . is not authority for what it does not consider."].)

E.H. also asserts that, in *People v. Mayfield* (1972) 23 Cal.App.3d 236, 242–243 (*Mayfield*), disapproved of by *People v. Hernandez* (2004) 33 Cal.4th 1040, the appellate court "ruled that the right to attack one's accuser is fundamental, and that non-cumulative attacks on credibility, bias or ulterior motives shall not be sustained [under Evidence Code section 352]." *Mayfield* is inapplicable here. In *Mayfield*, the defendant attempted to introduce testimony from a witness to challenge the credibility of a deceased witness. (*Id.* at p. 243.) The trial court denied the defendant's proffered testimony under Evidence Code section 352. (*Ibid.*) However, the deceased witness' hearsay testimony was the only evidence connecting the defendant to the crimes charged. (*Ibid.*) Under those specific circumstances, the appellate court concluded the trial court abused its discretion to exclude the defendant's proffered evidence. (*Ibid.*) The court did not, as E.H. suggests, conclude that, in all instances where a witnesses' credibility is challenged, the court cannot exclude evidence under Evidence Code section 352. Instead, in rendering its decision, the court in *Mayfield* specifically stated, "[d]iscretion exercised by the court pursuant to Evidence Code section 352 must be evaluated in the light of the circumstances of the particular case." (*Id.* at pp. 242-243.)

Finally, as stated above, the mere existence of a retaliatory motive does not necessarily negate compelling evidence of abuse or the victim's reasonable basis to fear the aggressor. (*Michael M. v. Robin J., supra,* 92 Cal.App.5th at p. 182.) Thus, even if further questioning would have produced evidence of Q.N. and J.P.'s collusion to harm E.H.'s business, such motive would not negate the undisputed evidence of E.H.'s stalking and harassment after Q.N. ended the relationship in December 2022. Under these circumstances, any error in excluding additional evidence about Q.N.'s alleged motives is harmless, and the exclusion of such evidence did not result in prejudicial error.

### E.    The Trial Court's Findings of Abuse

Conceding there was substantial evidence that E.H. stalked and harassed Q.N., E.H. nevertheless contends the trial court erred as a matter of law in its interpretation and application of "coercive control" under Family Code section 6320 when it ruled on Q.N.'s DVRO request.

Abuse under the DVPA includes conduct that disturbs the peace of the other party. (Fam. Code § 6320, subd. (a).)  In 2020, the legislature amended the statute to clarify and codify existing case law on non-physical and psychological forms of abuse.  (Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 1141 (2019-2020 Reg. Sess.) as amended Aug. 6, 2020, p. 6.)  Family Code section 6320 now provides that "disturbing the peace of the other party," includes "coercive control, which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty." (*Id.*, subd. (c).)  Coercive control includes, without limitation, isolation of the victim from friends, deprivation of basic needs, control of the victim's movement and daily behavior, finances and access to services, using force or intimidation to compel the victim to act a certain way, and coercing and controlling the victim's pregnancy.  (*Id.*, subd. (c)(1)-(5).)

The Court of Appeal for the Second District has interpreted "coercive control" to include conduct where the aggressor manipulated the victim into becoming financially dependent on him to keep her in the relationship and coerced her, through repeated threats and insults, into doing what he wanted in order to control her.  (*Parris J.*, *supra*, 96 Cal.App.5th at p. 128.)

Here, the trial court found that, after Q.N. initially ended the relationship in 2021, E.H. made a series of elaborate and false statements to manipulate Q.N. into resuming and continuing their relationship.  The court found such conduct to constitute "coercive control."  Although the DVPA statutes are to be construed broadly (*K.T. v. E.S.* (2025) 109 Cal.App.5th 1114, 1128), E.H.'s conduct does not rise to the level of "coercive

24

control" under Family Code section 6320. There was no evidence that E.H. isolated Q.N., restricted her personal liberties, exerted economic or financial control over her, or used force or intimidation to compel her to resume their relationship. Here, the evidence showed only lies and deceit which, by themselves, do not appear to meet the statutory definition of "coercive control". That said, even if we question the trial court's application of "coercive control" in this case, E.H. has not established grounds requiring reversal due to our established principles of appellate review. "[W]e must affirm the trial court's ruling if there is any basis in the record for doing so." (*Maryland Casualty Co. v. Reeder* (1990) 221 Cal.App.3d 961, 967; *J.B. Aguerre, supra,* 59 Cal.App.4th at pp. 15–16 [we affirm if correct on any theory, even if the trial court's reasoning was not correct].) Moreover, the trial court has broad discretion to determine whether to grant a petition for a DVRO. (*M.S. v. A.S.* (2022) 76 Cal.App.5th 1139, 1143-1144.)

Here, without the finding of coercive control, the record contains substantial (and undisputed) evidence to support the issuance of a DVRO for Q.N.'s protection. After Q.N. ended the relationship in December 2022, E.H. continued to text and email her. When she did not respond, E.H. drove to her home and sat outside in his car, as well as traveled to Germany where he believed she would be for a work event. Q.N. informed E.H. by email not to contact her and to stay away from her house and work. Yet, he continued to email her and, the very next week, E.H. showed up at her work. Such conduct alone (i.e., stalking, harassment, etc.) is ample evidence to support the issuance of a restraining order. Accordingly, we must affirm the order, even if the court's reasoning on "coercive control" was incorrect.

E.H. also contends that, had the court not erred in its definition of coercive control, it was reasonably probable that he would have obtained a better outcome. We are not persuaded. Aside from coercive control, the trial court also found E.H. engaged in harassing conduct, stalking, and behavior that destroyed Q.N.'s mental and emotional calm, all of which falls within the DVPA's definition of abuse for which restraining

25

orders are permitted. (Fam. Code §§ 6203, subd. (a) [definition of abuse]; 6320 [abusive conduct].) As we have stated above, the record contains substantial evidence to support the court's findings. The trial court reasonably could have concluded that, based on any of the three findings (E.H.'s harassment, stalking or destruction of Q.N.'s peace), a restraining order was warranted to protect Q.N. Accordingly, E.H. has not shown grounds justifying reversal of the court's orders.

### III.   DISPOSITION

The Domestic Violence Restraining Order after hearing entered on November 9, 2023 is affirmed. The court's order denying E.H.'s Request for Domestic Violence Restraining Orders entered on November 3, 2023 is affirmed.

Q.N. is awarded her costs on appeal.

_____

Rodriguez, J.*

WE CONCUR:

_____

Greenwood, P. J.

_____

Danner, J.

*Q.N. v. E.H.*
H051707

_____

* Judge of the San Diego County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.